IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JANE ROE,

    *Plaintiff-Appellant,*

    v.

    No. 21-1346

UNITED STATES, *et al.,*

    *Defendants-Appellees.*

## DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO VACATE OR DISQUALIFY

This is Roe's third attempt to cast doubt on the fairness of the panel assigned

to hear her appeal.  Her first two attempts focused on whether the intercircuit

assignment process for designating members of this panel suffered from an

unconstitutional appearance of partiality:  first, by highlighting the timing of the

disclosure of the intercircuit assignment orders in a motion seeking information about

the procedures used, *see* Motion To Clarify The Court's Order Disclosing The

Designation And Assignment Orders For This Appeal, at 4-8 (Motion To Clarify);

then, by suggesting more overtly that defendants may have attempted to influence the

outcome of her appeal in a motion to compel disclosure of records pertaining to the

intercircuit assignments made in this case, *see* Motion To Disclose Public Records

From The Intercircuit-Assignment Process In This Case, at 1-2 (Motion To Disclose).

The Court denied the first of these motions but scheduled argument on the second,

and ultimately decided to reserve ruling on Roe's disclosure request until after the Court had heard argument on the merits of the case.

Roe now urges that nothing short of vacatur will cure the deficiencies she perceives in the assignment process, while also not disputing that the judges assigned to hear the case in the district court and on appeal were and are fair and impartial. Mot. 21. In the alternative, Roe requests disqualification of this panel so that a new panel can be appointed for the express purpose of ordering vacatur. *Id.*

The motion should be denied. As defendants explained in their response to Roe's previous motion and at argument on that motion, the routine process of identifying judges who were available and willing to preside over Roe's case does not violate her due process right to a fair tribunal. As a result, Roe cannot demonstrate that vacatur is constitutionally required, especially now, when the panel is poised to conduct a de novo review of the merits of Roe's claims in a matter of weeks, and will do so in a concededly fair and impartial manner.

Nor can Roe demonstrate that the district judge or the members of this panel were required to "disqualify" themselves on the ground that their "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). In any event, vacatur would not be an appropriate remedy under that statute. Because Roe does not question whether the district court and this panel are impartial adjudicators, the process of designating the judges for her case does not create a "risk of injustice" to her, and vacatur is not

necessary to avoid "undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

1. The Chief Justice is charged by statute with the responsibility to designate visiting judges, but he does not act alone in the selection process. The Judicial Conference Intercircuit Assignment Committee, with the support of AO staff, assists the Chief Justice of the United States in coordinating the assignment of judges from one circuit to another. Def.'s Response To Motion To Disclose, at 2-4; Guidelines for the Intercircuit Assignment of Article III Judges, at 1-2 (2012) (Guidelines) (attached as Exhibit A to plaintiff's Motion To Disclose); *see also Occupy Nashville v. Haslam*, 769 F.3d 434, 435 n.* (6th Cir. 2014) (noting that three out-of-circuit judges "were designated by the Committee on Intercircuit Assignments of the Judicial Conference of the United States to comprise the panel for this appeal"); *In re Approval of Jud. Emergency Declared in Dist. of Ariz.*, 639 F.3d 970, 976 (decision of the Judicial Council of the Ninth Circuit, March 2, 2011) ("With the assistance of the U.S. Judicial Conference Committee on Intercircuit Assignments, additional visiting judges will continue to be recruited from all across the country for the foreseeable future or until the District receives the additional judicial resources it so desperately needs"); *Rosenfield v. Wilkins*, No. Civ.A. 305cv00072, 2006 WL 335612, at *2 n.1 (W.D. Va. Feb. 13, 2006) ("The Judicial Conference of the United States has a designated Committee on Intercircuit Assignments committed to assisting Chief Judges in assigning and designating Article III judges for service outside their circuits.").

Indeed, the selection process for a district court judge when "Fourth Circuit district judges" specifically are recused has been described publicly before. *Rosenfield v. Wilkins*, 468 F. Supp. 2d 806, 808 (W.D. Va 2006), *aff'd*, 280 F. App'x 275, 279 & n.7 (4th Cir. 2008).

Here, that routine administrative process worked as intended. The Fourth Circuit Clerk of Court notified an AO staffer of the need for an intercircuit assignment—first for a judge to preside over Roe's district court proceedings, and later for three judges to serve on a panel to hear her appeal. Ex. A (Decl. of Anne McKenna). As she has done in every case before, the AO staffer consulted a roster of judges who have previously indicated their willingness and availability to serve on panels for cases in which one or more judges have been recused. *Id.* The staffer contacted Judge Young, who indicated his availability and willingness to serve during the anticipated pendency of the proceedings. *Id.* To fill the need for judges to serve on this panel, the staffer similarly reached out to particular judges based on her understanding of the judges' availability and likely schedule, without considering the nature of the claims, Roe's factual allegations, or the legal issues likely to be presented in the case. *Id.* When the judges all indicated their consent to serve, the staffer notified the Committee Chair and the Clerk of Court so that the Certificates of Necessity and consent forms could be completed and transmitted to the Chief Justice. *Id.* The statutory authorities and Judicial Conference Guidelines that Roe cited in her previous motions make this process clear, and Roe has never identified

any alternative method for selecting and designating visiting judges that could have been or should be used when officials of the Judicial Conference or the AO are named in a lawsuit.[1] In light of this well-understood process, Roe's collateral attack on the district court judgment is both untimely and unwarranted. *See United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008) (parties must be "diligen[t]" in determining whether a judge should be recused).[2]

2. Roe has failed to identify any constitutional violation. At bottom, due process requires "[a] fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955). Defendants have described in detail how the intercircuit assignment process functioned in this case. *See* Def.'s Response to Motion To Disclose, at 2-6; *see also* Ex. A. Against that backdrop, defendants have also explained why the intercircuit assignment process did not deprive Roe of due process in this case. There can be little doubt that Roe received a full and fair adjudication in district court and has

---

[1] Roe misunderstands the panel-assignment process in *DeMasters v. Carilion Clinic*, 796 F.3d 409, 412 n.* (4th Cir. 2015), which was no different than the intercircuit-assignment process used here. The Court's notation that "a panel from the neighboring Third Circuit was appointed," *id.*, merely indicated that the three judges designated to hear that appeal were all from the Third Circuit, not that the case was "transferred in a ministerial fashion" (Mot. 16) or that the Third Circuit, rather than the AO or the Committee, selected its own judges to hear the case.

[2] Contrary to Roe's assertions, neither 28 U.S.C. § 295 nor the Guidelines on which Roe relies require the intercircuit-assignment orders to be "filed" on the Court's public docket for this case, or in the borrowing courts. *See also Seguin v. Textron*, No. 13-cv-012-SJM-LM, 2013 WL 5704953, at *1 (D.R.I. Oct. 17, 2013) (explaining that the designation order "is on file *in the clerk's offices*" in the borrowing and lending courts (emphasis added)).

continued to litigate her case before a fair tribunal on appeal. Roe does not contend

otherwise: she does not allege that the district court adjudicated her case unfairly, and

she "does not question the impartiality of the panel assigned to hear this appeal."

Motion To Disclose, at 15; Motion To Clarify, at 7; Mot. 1.

Given the lack of any actual bias on the part of Judge Young or the judges of

this panel—or even any allegations of bias—Roe's due process arguments focus on

what she contends is an *appearance* of partiality. *See* Mot. 17-18. Relying on the

Supreme Court's decisions in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009),

*Murchison*, 349 U.S. at 136, and *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1986),

she urges vacatur to satisfy the "appearance of justice." Mot. 20. But those decisions

and others make clear that circumstances giving rise to a mere appearance of partiality

do not violate due process unless there is also either "a serious, objective risk of *actual*

bias that required [the judge's] recusal," *Caperton*, 556 U.S. at 886 (emphasis added), or

the "*temptation* [for] the average . . . judge . . . *not to hold the balance nice, clear, and true.*"

*Id.* (emphasis added) (quoting *Murchison*, 349 U.S. at 136); *see also, e.g.*, *Richardson v.

Quarterman*, 537 F.3d 466, 476 (5th Cir. 2008) ("[T]he Supreme Court's 'appearance of

justice' language indicates that judges sometimes must recuse themselves when they

face possible *temptations* to be biased." (emphasis added and quotation marks

omitted)). Indeed, the Supreme Court has stressed that the Constitution requires

recusal in only the "extreme cases," where "extreme facts. . . create[] an

unconstitutional probability of bias." *Caperton*, 556 U.S. at 887. Thus, *Caperton* found

a due process violation where a party's campaign contributions to a judge's election campaign created a "substantial" "risk that [the party's] influence *engendered actual bias*." 556 U.S. at 885-86 (emphasis added).

Similarly, in *Murchison*, the Court held that the defendants' due process rights to an impartial tribunal were violated where the "judge presiding [over defendants'] contempt hearing" was the same judge who had acted as a "one-man grand jury out of which the contempt charges arose." 349 U.S. at 134 (quotation marks omitted). The Court explained that under those circumstances, "a judge cannot be, in the very nature of things, wholly disinterested" in the outcome of the trial because "it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session." *Id.* at 137; *see also id.* at 138 (noting that the judge had indeed based his "judgment" in part on "his own personal knowledge and impression on what had occurred in the grand jury room").

And in *Lavoie*, the Court concluded that an Alabama Supreme Court justice's failure to recuse himself violated due process where he had a "direct, personal, substantial, [and] pecuniary" stake in the outcome of the defendant's case, because the justice was himself a plaintiff in a pending lawsuit that raised similar legal issues. 475 U.S. at 824. In particular, the Court noted that the justice had cast the "deciding vote and authored the [Alabama Supreme Court's] opinion" resolving an "unsettled" question of state law in favor of the plaintiff. *Id.* at 822. As a consequence, the justice's participation "had the clear and immediate effect of enhancing both the legal

status and the settlement value of his own case," which settled in the justice's favor shortly after the decision was published.  *Id.* at 824-25.  Under those circumstances, the Court held that the justice's participation "on the case then before the Supreme Court of Alabama" would have "offer[ed] a possible temptation to the average . . . judge" to decide the case unfairly.  *Id.* at 825.

In all of these cases, "extreme" circumstances surrounding the judge's service gave rise to a risk of actual bias or a temptation to favor one litigant over the other. *Caperton*, 556 U.S. at 887.  But Roe identifies no such risks here:  no facts suggest that the district judge or the judges of this panel would be tempted to decide Roe's case on an improper basis, let alone that they suffered from an "objective risk of actual bias." *Id.* at 885-86.  Neither the district judge nor any of the judges of this panel is beholden to the parties in this case; none was hand-selected by any of the named defendants— Chief Judge Gregory, Circuit Executive James Ishida, AO Director Judge Mauskopf, Judge Miller (Chair of the Judicial Conference Committee on Judicial Resources), former AO General Counsel Sheryl Walter,[3] or the Federal Defender.  And the individuals involved in the actual selection of the judges for intercircuit assignment—a staffer and the Chair of the Intercircuit Assignment Committee—have no stake in the

_____

[3] On January 31, 2022, Sheryl Walter retired from her position as AO General Counsel.

outcome of Roe's case, because their duties are entirely disconnected from any of the institutional interests Roe claims exist.[4]

Institutional identity alone—the fact that the officials or employees involved in the intercircuit assignment process are affiliated with or employed by the Judicial Conference or the AO—is not sufficient to show any bias or to suggest an appearance of impropriety. The "institutional interest" of the AO and Judicial Conference generally is "too remote to create an unconstitutional conflict of interest" on the part of the staffer or Committee Chair, whose roles and duties are completely unrelated to the AO and Judicial Conference policies and activities that Roe's suit challenges. *Cain v. City of New Orleans*, 281 F. Supp. 3d 624, 653-54 (E.D. La. 2017) (citing *Dugan v. Ohio*, 277 U.S. 61, 63-65 (1928)). Roe's reliance (Mot. 12) on *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), to suggest otherwise is misplaced. *Al-Nashiri* found a conflict of interest where a judge serving on a military commission "adjudicate[d] [a] case[] involving [his] prospective employer[]": the military judge who presided over the defendant's trial was actively seeking employment as an immigration judge for the DOJ while a DOJ lawyer was prosecuting the case. *Id.* at 235. The Court focused on the fact that "the Attorney General himself" was both a "party to [the] case"—

_____

[4] Although Lee Ann Bennett provided defendants with a declaration regarding the role of the AO General Counsel's Office during Roe's EDR process, Ms. Bennett did not participate in the actual selection of judges and instead performed only the "ministerial act," Mot. 8 n.1, of transmitting to the Chief Justice the names of the judges identified as available and willing to serve on this panel.

because he serves "an important institutional role in military commissions" and had approved the assignment of a DOJ attorney to prosecute the matter—and the military judge's prospective "employer"—because he "directly" "select[s] and appoint[s] immigration judges." *Id.* at 235-36. Unlike in *Al-Nashiri*, neither the AO staffer nor the Committee Chair had any responsibilities or involvement with the Judiciary policies at issue in this case. Indeed, as the attached declaration makes clear, the staffer's identification of judges who could be designated by the Chief Justice was in no way affected by the impact Roe's case may have on Judiciary policies. Ex. A. Instead, the staffer identified the judges based on her understanding of their availability and willingness to serve for the duration of the district court and appellate proceedings. *Id.*

Roe suggests (Mot. 17) that any involvement by AO support staff in assisting the Chief Justice of the United States with the intercircuit assignment process rendered the district court's judgment void. But she conceded at oral argument that she would not have taken the same position if the district court had ruled in her favor. Oral Arg. Recording 30:32-55. That admission is telling and underscores why this Court should reject Roe's attempt to seize on the routine intercircuit assignment process as a collateral basis for attacking the judge in the court below solely because she is dissatisfied with the district court's judgment.

Roe also errs in contending that Chief Judge Gregory's and Circuit Executive James Ishida's knowledge of the panel's identity several months before it was revealed

to her created an "information asymmetry" that further "favored one party over another." Mot. 19-20. Those two officials were informed in their official capacities as Chief Judge and Circuit Executive of the borrowing circuit, *see* Guidelines, at 3-4, not because of their role as defendants in this case. And counsel for the defendants learned of the panel's identity at the same time as Roe, so there was no "fundamental[] unfair[ness]" stemming from Chief Judge Gregory's and Mr. Ishida's knowledge of the panel's identity. Indeed, Roe does not contend that such "asymmetry" created any prejudice affecting her appeal.

As with "most matters relating to judicial disqualification," any perceived irregularities Roe alleges in the selection process here "[do] not rise to a constitutional level." *Caperton*, 556 U.S. at 885 (quotation marks omitted). Numerous circuits are in accord. For instance, the Seventh Circuit has explained that the "Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance." *Del Vecchio v. Illinois Dep't of Corrs.*, 31 F.3d 1363, 1371-72 (7th Cir. 1994) (en banc). Similarly, in *Welch v. Sirmons*, 451 F.3d 675, 700 (10th Cir. 2006), *overruled on other grounds by Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009), the Tenth Circuit recognized, in the context of a habeas claim, that the Supreme Court's cases "cannot reasonably be read as 'stand[ing] for the conclusion . . . that a judge with an appearance of bias, without more, is required to recuse himself sua sponte under the Due Process Clause." *Welch*, 451 F.3d at 700 (quoting *Johnson v. Carrol*, 369 F.3d 253, 260 (3d Cir. 2004)); *see also Sinito v. United States*, 750 F.2d 512,

515 (6th Cir. 1984) (explaining that even if "there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with [applicable] rules," a party "is not denied due process as a result of the error unless [s]he can point to some resulting prejudice"). And under these circumstances, vacatur is plainly unwarranted. *Cf. Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1027 (5th Cir. 1982), *cert. denied*, 464 U.S. 818 (1983) ("[P]rocedural irregularities during the course of a civil case, even serious ones, will not subject the judgment to collateral attack.").

3. Roe is equally mistaken in contending that the selection process here required disqualification of the district court judge and vacatur under 28 U.S.C. § 455(a). Mot. 18-19. That statute requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "'Reasonably' is an important adverb." *United States ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, Nos. CIV. 93-165-P-H, CIV. 95-321-P-H, 1996 WL 173121, at *11 (D. Me. April 9, 1996) (concluding that media allegations of a judge's "bias, disparate and divergent treatment," which were "all demonstrably unfounded" did not require disqualification because no "reasonable person, *knowing all the circumstances*, . . . could have a basis for doubts"). No average observer would "reasonably" question the impartiality of the judges selected to hear Roe's case, particularly where Roe herself has repeatedly and publicly disavowed any suggestion that the judges in her case are biased or have treated her unfairly. *Id.*

Even if § 455 could have formed a basis for recusal of the district court judge, "mandatory recusal does not require mandatory vacatur." *Shell Oil Co. v. United States*, 672 F.3d 1283, 1293 (Fed. Cir. 2012). The Supreme Court has recognized that a judge's failure to recuse himself under § 455(a) could be "harmless error," and noted that "[t]here need not be a draconian remedy for every violation of § 455(a)." *Liljeberg*, 486 U.S. at 862. The Court there identified several factors to evaluate harmless error, including "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864.

A request for vacatur based on a § 455 violation cannot be predicated on "[a] mere showing that the impartiality of the judge might reasonably be questioned." *United States v. Cerceda*, 172 F.3d 806, 813 (11th Cir. 1999) (en banc). Nor is the "appearance of impropriety . . . enough to poison the [judgment]." *United States v. Murphy*, 768 F.2d 1518, 1541 (7th Cir. 1985). Instead, under the first *Liljeberg* factor, Roe "bears the burden of proving that potential bias on the part of the judge presented a risk of injustice to [her]." *Id.*; *see also Murphy*, 768 F.2d at 1541 (holding that judicial acts that occurred before the § 455(a) motion "may not . . . be set aside unless the litigant shows actual impropriety or actual prejudice"). As discussed above, Roe cannot make such a showing, especially because she does not dispute that Judge Young was fair and impartial in the handling of her case. By contrast, the risk of injustice to defendants is obvious: vacatur would inject needless delay, requiring

13

defendants, including those sued in their individual capacities, to spend time and resources to relitigate issues already decided by an impartial adjudicator, resulting, undoubtedly, in another appeal before a similarly impartial panel. *Cerceda*, 172 F.3d at 814-15.

The second *Liljeberg* factor—"the risk that the denial of relief will produce injustice in other cases"—favors vacatur only if it would "encourag[e] a judge or litigant to more carefully examine possible grounds for disqualification and disclose them when discovered." *Liljeberg*, 486 U.S. at 868. But if this Court were to hold that the intercircuit assignment process resulted in a violation of § 455, that conclusion alone—without the additional remedy of vacatur—would suffice to put defendants on notice that a different intercircuit assignment process must be followed in future cases naming the Judicial Conference or the AO as defendants. Vacatur is therefore "not necessary to deter" future violations of § 455. *Cerceda*, 172 F.3d at 815.

Finally, vacating the district court's judgment would "undermin[e]" rather than bolster "the public's confidence in the judicial process." *Cerceda*, 172 F.3d at 815. As discussed above, any violation of § 455 is far from clear, and Roe concedes that she suffered no actual bias or prejudice as a result of the intercircuit assignment process.

Roe does not engage with any of these factors. She claims in passing that vacatur is "require[d]" because the selection process "severely undermined" the "public's confidence in the judicial process." Mot. 19. But as *Liljeberg* and other courts have explained, in assessing whether vacatur is an appropriate remedy, the

question is not whether the *alleged violation* of § 455 undermines the public's confidence in the judicial process—presumably most violations do, by definition—but instead whether *vacatur* would increase or decrease the risk of undermining public confidence in the Judiciary. *See Liljeberg*, 486 U.S. at 867-68; *Cerceda*, 172 F.3d at 816. Because Roe has "failed to establish that [she] suffered any harm because of the circumstances that underlie the section 455(a) issue," there is a risk that "the public will lose confidence in the judicial process if the judgment[] were vacated, because the parties and the courts would be forced to relitigate the case even though the proceedings leading to [that] judgment[] seemed completely fair." *Cerceda*, 172 F.3d at 816.

Vacatur would be especially unwarranted here, where a concededly "unbiased court of appeals" will conduct a "*de novo* review" of the district court decision. *Cerceda*, 172 F.3d at 816 n.15. As several courts have recognized, vacatur is not appropriate where the challenged rulings are "subject to plenary review" by a court of appeals. *In re School Asbestos Litig.*, 977 F.2d 764, 787 (3d Cir. 1992); *Matter of Cont'l Airlines*, 981 F.2d 1450, 1463 (5th Cir. 1993) (concluding that "nothing would be gained by vacating and remanding this case" after conducting "plenary review" of the challenged order); *Camacho v. Autoridad de Telefonos de P.R.*, 868 F.2d 482, 490 (1st Cir. 1989) (holding that "judge's refusal to recuse himself was, at worst, harmless error" because court of appeals conducted de novo review of the district court's dismissal of plaintiff's complaint). Thus, even if this Court were to conclude that the district judge

15

should have been disqualified, its de novo review of the district court's dismissal order renders vacatur unnecessary to cure the district judge's failure to recuse.

4. Because Roe identifies no basis—constitutional or otherwise—for vacating the district court's judgment, her request for vacatur should be denied. And because the intercircuit assignment process also did not lead to any actual bias or create the appearance of partiality that would require recusal of this panel, the Court should also deny Roe's alternative request to disqualify the panel.

Respectfully submitted,

H. THOMAS BYRON III
 (202) 616-5367
 */s/ Amanda L. Mundell*
Amanda L. Mundell
(202) 514-3469
   *Attorneys, Appellate Staff*
   *Civil Division*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Room 7236*
   *Washington, D.C.  20530*

Gill P. Beck
   *Assistant United States Attorney*
   *Room 233, United States Courthouse*
   *100 Otis Street*
   *Asheville, NC 28801*

Shannon ("Missy") S. Spainhour
(252) 514-2828; Ext. 3634
   *Davis Hartman Wright PLLC*
   *4 Long Shoals Rd., Suite B-461*
   *Asheville, NC 38803*

*Counsel for Defendants-Appellees*

FEBRUARY 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals of the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*Amanda L. Mundell*
AMANDA L. MUNDELL

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4132 words. This filing also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*Amanda L. Mundell*
AMANDA L. MUNDELL

# EXHIBIT A

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JANE ROE,

*Plaintiff-Appellant,*

v.

UNITED STATES, *et al.,*

*Defendants-Appellees.*

No. 21-1346

## <u>DECLARATION OF ANNE MCKENNA</u>

1.      I am a senior attorney in the Judicial Services Office at the Administrative Office of the U.S. Courts.  I have worked for the AO since 2010 and have served as primary staff to the Committee on Intercircuit Assignments since 2015.

2.      Among other duties, I assist the Committee in maintaining a roster of judges who have indicated a willingness to serve in recusal cases outside of their circuits.

3.      When this case was originally filed in district court and, subsequently, in the court of appeals, the Fourth Circuit Clerk of Court contacted me and asked that I find a judge to preside over the district court proceedings and later for three judges to serve on a panel to hear the appeal.  As is typical in a recusal case, the Clerk did not discuss the details of the case with me but explained that all judges in the circuit recused themselves because the Fourth Circuit Court of Appeals and Fourth Circuit Judicial Council were named defendants.

4.      In finding judges for this district court case and appeal, I consulted the roster of judges who indicated a willingness to serve in recusal cases outside of their circuits, as I have previously done in every case in which one or more judges have recused themselves.

5.      My identification of judges who could be designated by the Chief Justice was in no way affected by the nature of the claims, the factual allegations, the legal

issues likely to be presented in the case, or the impact the case may have on Judiciary policies. Instead, I identified the judges based on my understanding of their availability and willingness to serve for the duration of the district court and appellate proceedings.

6. In this case, as in all other recusal cases I have handled, the only people involved in identifying judges to recommend for the Chief Justice's ultimate designation and assignment were the Chair of the Committee on Intercircuit Assignments and me. In this case, as in all other recusal cases I have handled, no one in the AO Director's Office, General Counsel's Office, Judicial Council Secretariat, or any other AO office played any role whatsoever in identifying judges to preside over the proceedings.

7. Other than my day-to-day contact with the Chair to support the intercircuit assignment process, I have no contact with any other Judicial Conference members as it relates to recusal judges.

8. Once the judges all indicated their consent to serve, I notified the Committee Chair and the Fourth Circuit Clerk of Court of those judges' names so that the Clerk's assistant could complete the certificates of necessity and obtain the circuit chief judge's signature for the certificates.

9. Until plaintiff recently made the intercircuit assignment process an issue in this litigation, I had no discussions with any of the named defendants about this case.

10. My office is in the Judicial Services Office (JSO), which is under the Department of Program Services. The chief of the Department of Program Services reports to the AO Deputy Director. The Director's office is not involved in the day-to-day operations of JSO.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*s/ Anne McKenna*
Anne McKenna
Senior Attorney
Judicial Services Office
Administrative Office of the
U.S. Courts

Executed on: February 17, 2022